UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COPPER STATE HOLDINGS, INC.,      )
PAUL STEPHEN BEATTY,              )
                                  )
              Plaintiffs,         )
                                  )
       v.                         )      No. 1:23-cv-00791-JPH-MKK
                                  )
ZEBULUN MOUNTAINS, INC. Attn:     )
Grazyna Tondel, Registered Agent, )
NATIONAL SALVAGE & SERVICE        )
CORPORATION Attn: Grazyna Tondel, )
Registered Agent,                 )
NSSX TRANSPORTATION, LLC. Attn:   )
Grazyna Tondel, Registered Agent, )
VICTORIA SCHOPP President,        )
CURTIS SCHOPP,                    )
ZEBULUN MOUNTAINS, INC. Unknown   )
Shareholders, attn. Victoria Schopp, )
                                  )
              Defendants.         )

**ORDER GRANTING DEFENDANTS' MOTION TO
ENFORCE SETTLEMENT AGREEMENT**

This case stems from a corporate transaction gone awry.  Defendants

allege that before Plaintiffs filed this case, the parties reached an enforceable

settlement agreement that precludes Plaintiffs from pursuing their claims.

Currently before the Court is Defendants' motion to enforce settlement

agreement.  Dkt. [26].  For the reasons that follow, that motion is **granted**.

**I.
Background**

Copper State Holdings (CSH) and Zebulun Mountains, Inc. (ZMI) were

parties to a Membership Interest Purchase Agreement whereby CSH agreed to

sell its membership interest in Family Tree Service, LLC d/b/a Family Tree

1

Contracting, to ZMI.  Family Tree was a subsidiary of CSH. Paul Beatty is a

shareholder of CSH while Victoria and Curtis Schopp are shareholders of ZMI.[1]

     After CSH and ZMI each alleged that the other breached terms of the

Purchase Agreement, they engaged in negotiations to settle their claims.  Seven

issues were at the heart of the negotiations: (1) employees; (2) equipment; (3)

non-solicitation/non-disparagement; (4) healthcare coverage; (5) credit cards;

(6) professional fees and costs; and (7) unwinding.  Dkt. 27-2 at 15–19.  Key

communications and events related to the parties' negotiations are summarized

below:

- February 27, 2023: ZMI's President Victoria Schopp sends a proposed settlement offer to Mr. Beatty.  Dkt. 27-2 at 2.

- March 6–7: Mr. Beatty rejects the offer and sends a counteroffer.  *Id.* at 4–6. ZMI's counsel rejects and sends a counteroffer.  *Id.* at 7–8.

- March 9: CSH's counsel emails ZMI's counsel to provide "a brief summary of the proposed resolution" that "remains subject to further comments" from Mr. Beatty.  *Id.* at 9.

- March 10: ZMI's counsel responds with a Reply Letter and says, "if you agree with the contents of this Reply Letter it will serve as the basis for the Settlement Agreement . . . that I will draft."  *Id.* at 15.  In the Reply Letter, ZMI:
    - Accepts terms on employees and on equipment, each subject to conditions.  *Id.* at 15–16.
    - Accepts terms on non-solicitation and on credit cards.  *Id.* at 16–17.
    - Rejects and counters terms on healthcare. *Id.* at 17.
    - Rejects terms on professional fees and costs. *Id.*
    - Discusses unwinding.  *Id.* at 17–18.

---

[1] Throughout this Order, Plaintiffs are referred to as CSH, and Defendants, including National Salvage & Service Corporation and NSSX, are referred to as ZMI.  Mr. Beatty and the Schopps are referred to by name where appropriate.

- March 13: CSH's counsel responds to the Reply Letter with an email that "accept[s]" some parts of the Letter but not others.  *Id.* at 19.  CSH:
  - Rejects ZMI's conditions on employees and equipment.
  - Reaffirms its agreement on non-solicitation and credit cards.
  - Counteroffers on healthcare.
  - Reiterates its position on professional fees.
  - Accepts and adds an additional term on unwinding.

- March 14: ZMI's counsel responds back with a new Reply Letter countering on some of the outstanding issues and agreeing to others.  *Id.* at 20–23.
  - ZMI accepts terms on healthcare.  *Id.* at 22.
  - ZMI accepts terms on unwinding.  *Id.* at 23.

- At this point, the remaining issues for resolution are (1) employees, (2) equipment, and (3) professional fees.

- March 20: CSH's counsel responds that he had spoken with Mr. Beatty and he "accepted all the other points except for" employees and equipment.  *Id.* at 24.  CSH's counsel then outlined counterproposals on those two points.  *Id.*

- March 21: ZMI's counsel rejects CSH's counterproposal, noting that he had discussed it with Ms. Schopp and that she had discussed it with Mr. Schopp.  *Id.* at 27.  ZMI's counsel counteroffers on the two unresolved issues—employees and equipment.  *Id.* at 27.

- CSH's counsel responds and says Mr. Beatty "will accept with this new 3-part payment structure."  CSH's counsel asks if ZMI's counsel would  "prepare the initial draft of the settlement agreement."  ZMI's counsel agrees to prepare the "initial draft."  *Id.*

- March 22: ZMI's counsel emails the "draft Settlement Agreement and Release," adding, "Let me know what you think.  No pride of authorship."  *Id.* at 29.  CSH's counsel confirms receipt.  *Id.*

- March 23: ZMI's counsel emails agents at Houchins Insurance Group stating that "We have a Settlement Agreement in principle with" with Mr. Beatty and his company.  Dkt. 43-2 at 7.

- March 27: ZMI's counsel emails CSH's counsel as to "the status of your edits to the draft Settlement Agreement/Release."  Dkt. 43-2 at 6.  CSH's counsel replies that he has not yet reviewed it.  *Id.*

3

- March 30: ZMI's counsel asks for an "update on any proposed edits to the Settlement Agreement draft."  *Id.* at 4.

- April 4: CSH's counsel informs ZMI's counsel that they "had given [Mr. Beatty] some comments on the draft Agreement and Mr. Beatty is "still reviewing" it.  *Id.* at 3.

- April 10: ZMI's counsel emails CSH's counsel to say that "[w]ith the Agreement still in draft stage" the first payment deadline of April 15 will "likely" need to be moved.  *Id.* at 2.

- April 21, 2023: ZMI receives a letter from a new attorney representing CSH and Mr. Beatty that includes a new demand for settlement.  Dkt. 27-1 at 5–6.

Mr. Beatty testified that upon his review of the proposed written settlement agreement, he noticed that certain "material terms" were different than what had been discussed between the parties' counsel.  Dkt. 43-1 at ¶ 5. No payments were made pursuant to the draft Settlement Agreement.  *Id.* at ¶ 8.

CSH sued ZMI and its subsidiaries, bringing claims for breach of contract, fraud, unjust enrichment, and conversion.  Dkt. 1.  ZMI filed a counterclaim for breach of the settlement agreement.  Dkt. 21 at 19.  ZMI then filed a motion to enforce the settlement agreement.  Dkt. 26.  ZMI has also filed a motion to strike certain statements in Mr. Beatty's affidavit, dkt. 43-1.  Dkt. [45].   Both motions are fully briefed.

## II.
## Applicable Law

Since the parties rely on Indiana law in support of their respective arguments, dkts. 27; 43; 44, the Court applies Indiana law.  Absent a controlling decision from the Indiana Supreme Court, the Court does its best to

4

predict how that court would rule on the issues of law. *Mashallah, Inc. v. West Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021); *Bancorpsouth, Inc. v. Fed. Ins. Co.*, 873 F.3d 582, 586 (7th Cir. 2017) ("A federal court sitting in diversity must attempt to resolve issues in the same manner as would the highest court of the state that provides the applicable law."). In doing so, the Court may consider decisions from the Indiana Court of Appeals. *Mashallah*, 20 F.4th at 319.

"Settlement agreements are governed by the same general principles of contract law as other agreements." *Georgos v. Jackson*, 790 N.E.2d 448, 453 (Ind. 2003). "The existence of a contract is a question of law." *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180 (Ind. Ct. App. 2011).

### III.
### Analysis

"Indiana law strongly favors settlement agreements. . . . And it is established law that if a party agrees to settle a pending action, but then refuses to consummate his settlement agreement, the opposing party may obtain a judgment enforcing the agreement." *Georgos*, 790 N.E.2d at 453. "Settlement agreements are governed by the same general principles of contract law as any other agreement." *Id.* A contract's "basic requirements are offer, acceptance, consideration and a meeting of the minds of the contracting parties." *Sands*, 945 N.E.2d at 180. "To determine whether a contract is enforceable, there are two interrelated areas that must be considered: intent to

5

be bound and definiteness of term." *Id.* "Only essential terms need be included in order to render a contract enforceable." *Id.*

### A. Intent to be bound

ZMI argues the parties' conduct shows that they intended for counsel to negotiate an enforceable settlement agreement on their behalf. Dkt. 27 at 13–16. CSH argues that counsel's communications, dkt. 27-2, were only preliminary negotiations, and the parties intended that a settlement agreement would become enforceable only upon execution of a written agreement signed by both clients. Dkt. 43 at 12–14.

The parties' offers and counteroffers focused on seven discrete issues. *See, e.g.*, dkt. 27-2 at 21–23 (counteroffer letter dated March 14, 2023, identifying seven issues that were the subject of negotiations). At times, Mr. Beatty and Ms. Schopp were copied on these emails. *See, e.g.*, *id.* at 19. Negotiations had been ongoing for approximately a month when CSH's counsel informed ZMI's counsel that he had just spoken with Mr. Beatty who had "accepted all the other points except for" two remaining issues—employee payment and equipment. *Id.* at 24. CSH then suggested a resolution to each. *Id.* ZMI's counsel rejected those counteroffers and sent a "final offer." *Id.* at 27. CSH's counsel responded that "[Mr. Beatty] will accept" the final offer. *Id.* at 30. ZMI then offered to draft the settlement agreement and did so. *Id.* at 29–30.

Under Indiana law, a signed document is not required for a settlement agreement to be enforceable. Instead, "[p]arties may make an enforceable

contract which obligates them to execute a subsequent final written agreement." *Sands*, 945 N.E.2d at 180 (citing *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996)).  In *Sands*, defendant's counsel emailed plaintiff's counsel offering to agree to dismissal of their lawsuit in exchange for dismissal of a separate suit in Wisconsin.  945 N.E.2d at 179.  Plaintiff's counsel responded "Deal. Mr. Johnson will work with you . . . to get papers done." *Id.* Defendant's counsel later added, "When we get this agreement finalized, I believe it will be a simple matter of substitution to get the Sands-Helen HCI agreement done. Thanks." *Id.*  After receiving documents from Mr. Johnson, defendant's counsel emailed that because the "draft settlement documents" were "not acceptable," there was no enforceable settlement agreement.  *Id.* at 180.

The Indiana Court of Appeals held that "the parties entered into a binding contract which required the subsequent execution of a document memorializing their agreement and there is no uncertainty as to any substantial term of the settlement contract." *Id.* at 181; *see Jetz Service Co. v. Ventures*, 165 N.E.3d 990, 994–95 (Ind. Ct. App. 2021) (enforcing a settlement agreement because the parties' "exchange of emails created a contract, and the execution of a more elaborate written agreement to memorialize the contract was not required"). So while "a mere agreement to agree at some future time is not enforceable," an enforceable agreement exists so long as the communications "do not refer to future negotiations or use conditional,

contingent language." *Block v. Magura*, 949 N.E.2d 1261, 1266–67 (Ind. Ct. App. 2011).

Here, while the parties' communications show that they intended to eventually reduce their agreement to writing, a written agreement signed by both principals was not a condition precedent to forming an enforceable agreement.  Instead, the parties exchanged offers and counteroffers on a defined set of issues and came to a resolution on each.  *See, e.g.*, dkt. 27-2 at 19.  Because there was no uncertainty regarding resolution of the disputed issues, the "initial draft" that ZMI's counsel offered to write was "a mere memorial of the agreement already reached." *MH Equity Managing Member, LLC v. Sands*, 938 N.E.2d 750, 757 (Ind. App. Ct. 2010); *Block*, 949 N.E.2d at 1267.  In this context, execution of a written settlement agreement was a condition of performance, rather than formation of an enforceable agreement. *Sands*, 945 N.E.2d at 181.

CSH resists this conclusion, arguing that counsel's communications were "textbook preliminary negotiations that show no intent to be bound and fully demonstrate that a 'subsequent written document' (i.e., the draft settlement agreement) was necessary in order to bind the Parties."  Dkt. 43 at 14.  CSH designates as evidence Mr. Beatty's affidavit in which he states, "nothing would be final until a satisfactory written agreement was reviewed, approved, and executed by me on behalf of Plaintiffs, and this was communicated to [ZMI's counsel]." Dkt. 43-1 at ¶ 3.  ZMI responds that they were unaware of any such requirement.  Dkt. 44 at 6.  Mr. Beatty's affidavit on

8

this point is conclusory and does not provide any information regarding how or when ZMI's counsel was informed that Mr. Beatty had conditioned settlement on execution of a written settlement agreement.  The only evidence that CSH designates in support of Mr. Beatty's statement is an email from CSH's counsel stating to ZMI's counsel that the proposals outlined in the email "remain[ed] subject to [Mr. Beatty's] further comments."   Dkt. 27-2 at 9; *see* dkt. 46 at 2 (CSH brief explaining ZMI's knowledge of the execution requirement came from the "further comments" email); *see also* dkt. 43 at 6.

CSH's email regarding Mr. Beatty's "further comments," however, does not say or suggest that Mr. Beatty's signature on a final written settlement agreement was necessary to make the negotiated agreement enforceable, but only that Mr. Beatty needed to provide comments on that proposal.  "The intent relevant in contract matters is not the parties' subjective intents but their outward manifestations of it." *SWL, LLC v. NextGear Cap., Inc.*, 131 N.E.3d 746, 753 (Ind. Ct. App. 2019).  Indeed, the subsequent email communications show that Mr. Beatty was both aware of and approved of the settlement agreement.  Dkt. 27-2 at 30 (email from CSH's counsel noting Mr. Beatty "will accept" in reference to the final sticking points); *see Sands*, 945 N.E.2d at 180 (relying on emails to determine the parties' intent).

CSH next argues that the parties' references to the Settlement Agreement as a "draft" shows that they intended an enforceable agreement to be contingent on execution of a written Agreement.  Dkt. 43 at 13.  ZMI argues that the parties' course of conduct shows that counsel's negotiations resulted

in an enforceable agreement.  Dkt. 44 at 7–8.  While counsel's communications referred to a "draft" Agreement, there was no uncertainty about resolution of the disputed issues.  Instead, they came to specific agreements on each of the seven issues.  *See, e.g.*, dkt. 27-2 at 19.  Once the last two sticking points were resolved, CSH's counsel wrote that Mr. Beatty "will accept" and asked ZMI's counsel to prepare the initial draft of the agreement.  *Id.* at 29.  CSH's conduct shows they intended to be bound to the terms of the agreement, so "the mere reference to a formalized future contract does not void the presently existing agreement.".  *See UFG, LLC v. Southwest Corp.*, 784 N.E.2d 536 (Ind. Ct. App. 2003).

CSH next argues that ZMI failed to perform under the agreement because ZMI did not send Mr. Beatty installment payments at the times agreed upon during negotiations.  Dkt. 43 at 15.  But ZMI correctly argues that the failure to pay in these circumstances goes to performance of the terms of the settlement agreement rather than formation the agreement.  Dkt. 44 at 10; *see Sands*, 945 N.E.2d at 181 ("executing [portions of the contract] would constitute the full performance of the contract, not its formation").  Therefore, the failure to pay does not make the contract unenforceable.[2]

Last, CSH argues that ZMI's counsel's email to their insurance agent referencing an "agreement in principle" shows the agreement had not been sufficiently finalized.  Dkt. 43 at 14.  ZMI replies that the relevant evidence as

---

[2] Since the payment issue is relevant to performance and not formation, the Court does not address ZMI's argument that payment was not made because CSH breached. Dkt. 44 at 11.

to whether the parties intended to be bound is the communications with one another, not third parties.  Dkt. 44 at 9.  Although use of the phrase "agreement in principle" may be "an expression of a desire not to be bound," dkt. 43 at 14 (citations omitted), it is not controlling here because it's used in an email to a third-party, and that cannot override the intent of the parties. *See Zimmerman v. McColley*, 826 N.E.2d 71, 78 (Ind. Ct. App. 2005).  "The intent relevant in contract matters is not the parties' subjective intents but their outward manifestations of it."  *See SWL, LLC*, 131 N.E.3d at 753.  The parties' conduct and communications with one another show they intended to be bound by the agreements reached through emails and letters.[3]

## B. Definiteness of term

"All that is required to render a contract enforceable is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom."  *Conwell v. Gray Loon Outdoor Mktg. Grp. Inc.*, 906 N.E.2d 805, 813 (Ind. 2009).  "[A]bsolute certainty in all terms is not required."  *Id.*  "Only essential terms need be included to render a contract enforceable."  *Id.*

ZMI argues that the parties came to definite terms in their emails and letters.  Dkt. 27 at 14.  ZMI summarizes the agreements reached on most of the issues, *id.* at 14–15.  CSH responds that the written Agreement's terms

---

[3] The same reasoning applies to the dueling affidavits submitted by ZMI's counsel and Mr. Beatty.  Dkts. 27-1 at ¶ 35; 43-1 at ¶ 5.  ZMI's affidavit says the parties reached an agreement; Mr. Beatty's says the opposite.  Regardless of what the affidavits—which were created for litigation—say, the outward conduct of the parties to one another during their negotiations is what matters.  *See SWL*, 131 N.E.3d at 753.

11

regarding two issues were materially different from those discussed over email: (1) the non-solicitation agreement in the Agreement was broader, dkt. 43 at 19, and (2) the settlement payment included an additional contingency, *id.* at 20–21.

In their negotiations, the parties agreed to non-solicitation specifics, *see* dkt. 27-2 at 16–17, and a three-part payment structure, *id.* at 27.  If CSH believed that ZMI had changed the material terms in the draft Agreement, CSH could have rejected those different terms and insisted that the non-solicitation and payment provisions conform to the agreement reached in counsels' communications.  *See* dkt. 27-2 at 29 (email from Defendants' counsel tendering draft Agreement and stating "Let me know what you think. No pride of authorship.").  While ZMI cannot add to the subsequent written Agreement "a material term that is not already agreed on," *MH Equity*, 938 N.E.2d at 757, the emails were definite enough to create a binding settlement agreement, *see* dkt. 27-2 at 27 (payment agreement); dkt. 27-2 at 9, 17 (non-solicitation agreement).  ZMI's description of the terms of settlement regarding non-solicitation and payment in the subsequent written agreement—whether accurate or not—does not void the agreement that the parties reached.

### C. Counsel's authority to bind

CSH argues that ZMI's counsel lacked authority to bind Defendants to the settlement agreement.  Dkt. 43 at 17; *see Bay v. Pulliam*, 872 N.E.2d 666, 668 (Ind. Ct. App. 2007) ("[A]n attorney may not settle a claim without the client's consent.").  ZMI argues that their counsel had at least apparent

12

authority to resolve the claims.  Dkt. 44 at 13.  CSH has not presented evidence or argument that ZMI's counsel lacked apparent authority.

"Apparent authority exists where the actions of the principal give the other party the reasonable impression that the agent is authorized to enter into an agreement on behalf of the principal." *Zimmerman*, 826 N.E.2d at 79. "Placing an agent in a position to act and make representations which appear reasonable is sufficient to endow him with apparent authority." *Id.*  "[W]hen a party places an agent in the position of sole negotiator on his behalf, it may be reasonable for the third person to believe that the agent possesses authority to act for the principal." *Id.*

Negotiations began with a letter from Ms. Schopp that was copied to her counsel.  Dkt. 27-2 at 2–3.  After that, ZMI's counsel stepped in and conducted all further negotiations on ZMI's behalf.  *See* dkt. 27-2 at 7–40.  In doing so, he copied Ms. Schopp on emails and told CSH's counsel that he had conferred with her during the negotiation process.  *See, e.g.*, dkt. 27-2 at 26–27.

Ms. Schopp placed her counsel in a position to be the sole negotiator on ZMI's behalf and her counsel then did so.  *See Zimmerman*, 826 N.E.2d at 80 (finding the undisputed evidence showed that when an insurance company placed an employee in "the position of sole negotiator" it made "the necessary manifestation to instill a reasonable belief that . . . [the employee] had the authority to bind [the insurance company], and . . . [the employee] did nothing to dispel that notion").  ZMI's counsel had apparent authority to bind ZMI to the settlement.

Therefore, the settlement agreement reached in the emails and letters, dkt. 27-2, is enforceable.

**D. Motion to strike**

ZMI moved to strike two paragraphs of Mr. Beatty's affidavit.  Dkt. 45.  In his affidavit, Mr. Beatty said that his counsel had "permission to negotiate terms in an effort to settle the foregoing disputes but nothing would be final until a satisfactory written agreement was reviewed, approved, and executed by me on behalf of Plaintiffs, and this was communicated to Mr. Rushenberg" and that "no settlement was agreed upon, and the draft settlement agreement was never executed."  Dkt. 43-1 at ¶ 3, 7.  But, as explained above, neither of these statements make the settlement agreement unenforceable.  Therefore, the motion to strike is **denied as moot**.  Dkt. 45.

**IV.**
**Conclusion**

Defendants' motion to enforce settlement agreement is **GRANTED**.  Dkt. [26].  Defendants' motion to strike is **DENIED AS MOOT**.  Dkt. [45].  The Magistrate Judge is asked to hold a status conference to discuss case management and settlement.

**SO ORDERED.**

Date: 8/1/2024

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

Magistrate Judge Tim Baker

14